```
 1            SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2                 FOR THE COUNTY OF SAN BERNARDINO
 3        DEPARTMENT 3        HON. JOHN M. PACHECO, JUDGE
 4
 5   THE PEOPLE OF THE STATE    )
     OF CALIFORNIA,             )
 6              Plaintiff,      )
                                )
 7   V.                         )   SUPERIOR COURT
                                )   CASE NO: FSB-044914
 8                              )
                                )
 9   LISA LIBERI RICHARDSON,    )
                                )
10              Defendant.      )
11   _____)
12
13         REPORTER'S TRANSCRIPT OF PRELIMINARY HEARING
14                    AND BAIL/OR HEARING
                        AUGUST 4, 2004
15
16   APPEARANCES:
17
     FOR THE PEOPLE:            MICHAEL RAMOS
18                              District Attorney
                                BY: JAMES SECORD
19                              Deputy District Attorney
20
     FOR THE DEFENDANT:         EDI M.O. FAAL
21                              Attorney at Law
22
23
24
25
26
     REPORTED BY:               COLLEEN SOUTHWICK
27                              CSR-RPR NO. 9949
28
```

COPY

113

1 THE COURT: Withdraw that last question?
2 MR. FAAL: No, your Honor, at this point in
3 time I have no further questions.
4 MR. SECORD: Nothing further, your Honor.
5 THE COURT: Thank you.
6 MR. SECORD: For the record, your Honor, I'm
7 turning over to defense a copy of the jail tapes. They
8 are on CD. The copy is entitled Liberi, Lisa
9 04073420299. It bears a date of 7/29/04 but it has
10 jail conversations from the period of incarceration
11 through 7/28/04 for discovery purposes.
12 MR. FAAL: Thank you.
13 THE COURT: Okay. Thank you. All
14 right. Anything further?
15 MR. SECORD: On this issue, no, your Honor.
16 I would recall Investigator Liebrich to the stand for
17 our motion to increase bail.
18 MIKE LEIBRICH,
19 having previously been sworn as a witness, was recalled
20 on behalf of the People and testified further as
21 follows:
22 MR. SECORD: Thank you, your Honor.
23
24 DIRECT EXAMINATION
25 BY MR. SECORD:
26 Q. You realize you're still under oath?
27 A. That's correct.
28 Q. All right. In the course of your

```
                                                              114
 1   investigations, did you listen to conversations between
 2   the defendant and her mother emanating out of the jail?
 3        A.   I listened to the majority of them, not all
 4   of them.
 5        Q.   Okay.  How many conversations in total were
 6   there provided to you?
 7        A.   More than half a dozen.
 8        Q.   Let me rephrase it.  On the disc that I just
 9   gave Mr. Faal there's a significant number of
10   conversations; is that correct?
11        A.   63 in total.
12        Q.   63 in total.  And of those do you have an
13   estimate as to how many you've listened to?
14        A.   Roughly 40, 45.
15        Q.   And of those you've listened to are
16   conversations between the defendant and her mother?
17        A.   That's correct.
18        Q.   Okay.  With respect to those conversations
19   between the defendant and her mother, has the defendant
20   indicated a desire to seek retribution against a family
21   member?
22        A.   Yes.
23        Q.   Who is she seeking retribution against?
24        A.   Her sister Cheryl.
25        Q.   In the reports that were prepared with
26   respect to the case in which you testified at the
27   preliminary hearing earlier today, was there a report
28   by an Officer Schreiber, Investigator Schreiber
```

115

1  concerning an interview he had with Cheryl Richardson?
2      A.   Yes, that report had to do with the previous
3  19 charges, not the ones that were discussed today.
4      Q.   All right.  And was there an indication in
5  those conversations between the defendant and her
6  mother an understanding by the defendant that she had
7  obtained, that the defendant had obtained a copy of
8  that police report?
9      A.   Yes.
10     Q.   What did the defendant indicate she wanted to
11 do with regard to her sister?
12     A.   Actually as far as harm, she discussed that
13 with her husband Brent.  As far as with her mother, she
14 was angry at her and was basically done with her
15 sister.
16     Q.   And with respect to Brent, did she
17 indicate -- did she make threats about her sister?
18     A.   Yes.
19     Q.   What did she say?
20     A.   First thing was that she believed that her
21 sister had an outstanding warrant in the State of
22 Arizona.  She was going to somehow get her arrested and
23 then spread throughout the jail system that she was
24 quote unquote "a rat" and she told her husband Brent,
25 "You know what they do to rats in jail?"
26     Q.   Investigator Leibrich, you were with the L.A.
27 County Sheriff's Department for a number of years,
28 correct?

```
                                                              116
1        A.   That's correct.  Over 20.
2        Q.   Did you ever work the jail?
3        A.   Oh, yes.
4        Q.   And what happens when inmates discover that
5   another inmate is a snitch?
6        A.   There is what is known as a contract, a green
7   light on them.  Different things; they are attacked
8   and/or killed.  In fact, you brought up L.A. County,
9   in the last year five have been killed within the jail
10  system.
11       Q.   Did you also listen to any conversations
12  where the defendant indicated that she wanted to leave
13  the State of New Mexico?
14       A.   Yes.
15       Q.   Okay.  Did she -- were there conversations --
16  would you please describe what those conversations
17  consisted of?
18       A.   She was speaking to her husband Brent who was
19  based out of New Mexico.  She said she was quote
20  unquote "done", that when the lease was up at the end
21  of the month of August, that she wanted to leave.  She
22  was not going to tell anybody where she was going to
23  go.
24       Q.   Okay.  Did she also indicate anything to her
25  husband about finding a new job?
26       A.   She inquired of her husband that even though
27  he liked his job, she asked him, "You can find a
28  transfer, can't you?  We should leave.  Let's go to
```

```
                                                          117
 1   Georgia, Florida anywhere."
 2           MR. SECORD:  Nothing further.
 3           THE COURT:  Mr. Faal.
 4
 5                     CROSS-EXAMINATION
 6   BY MR. FAAL:
 7       Q.  Did Ms. Liberi say that she wanted to abscond
 8   when she gets out on bail?
 9       A.  She did not use the word abscond.
10       Q.  She was talking about relocating from the
11   State of New Mexico to the State of Georgia or the
12   State of Florida, right?
13       A.  She said that once again she was going to
14   leave and not tell anyone where she was going to go.
15       Q.  Did she say that, based on your testimony,
16   she already knew that her sister had given statements
17   to the police that implicated her in this case,
18   correct?
19       A.  In the prior 19 charges, yes.
20       Q.  Yes?
21       A.  Yes.
22       Q.  Okay.  Did she make it clear as to whether
23   she was referring to not telling family members or
24   whether she was talking about not telling the Court or
25   the bail bonds as to where she was?
26       A.  What she said was she's not going to tell
27   anyone.  Not anyone.
28       Q.  But that conversation came up in the context
```